Thank you, Your Honor. May it please the Court, Casey Bruner on behalf of Appellant Mark Peterson. There were eight total issues that we submitted as error in this case, four legal and four evidentiary. What do you think your strongest ones are? Usually when we see eight issues, some are better than others. So why don't you tell us and then we'll tell you whether you're right. I was going to focus this morning on the four legal ones which we believe to be the strongest and in particular two primary legal issues, unless the Court has specific inquiries into any of them. The first issue that we believe is the most clear error is the response to the jury question issue. Which there's the response or the two jury instructions? There's the jury instruction issue which was the combination of 9.3 and 9.1 in the model. But the one I was going to focus on was the response to the jury's question. On that jury instruction? Do you... On the malicious prosecution. Oh, on the malicious prosecution. You're going to argue about what institute means? Yes. How did I guess that? That was our first one and as we said in the reply brief, it's pretty clear on its face that this is contrary to Washington law. The model instruction or the proposed instruction by both parties cited the case of Peasley versus Puget Sound which was from the 1940s and is Washington's seminal case on malicious prosecution which is a state law tort. The instruction asks that a person can be found liable for instituting or continuing a criminal prosecution and there was no definition in the instruction provided by the Court. At the end of the first day of jury deliberations, the jury submitted a question and asked for clarity on what does it mean to institute a criminal prosecution. The trial court without asking for input from either side and on its own responded and did not say to any authority that institute means to file the criminal... Excuse me. I want to quote this correctly. It means to file the complaint. I take it this particular district judge does not permit re-argument? We ask... Do you know what I mean by that? I do not, Your Honor. If you can clarify. In some districts, for example, my home district of Arizona, when an issue like this comes up, and the jury says we have a problem with X, they allow the lawyers to argue just that point, to re-argue just that point in front of the jury. I take it that's not done here? That was not done here. It was not even offered and in fact, after... I'm not suggesting that it even should be. No. I was just wondering. But to show how limited opportunity we had to be heard on the issue at all, after the response to the jury, plaintiff asked numerous times, three, four, five times in email, in e-filing, let us be heard on this issue because it is legally incorrect. And to the district court, we provided the Turngrin case and the Bender case and said, look at these cases. These are not criminal prosecutors who are being held liable for this tort. These are permitted torts that the courts have approved. They're not criminal prosecutors and yet, you've limited this instruction to be only the person who filed the complaint, which was Cynthia Martinez. Cynthia Martinez is not in that court. So that's really your argument here why this is problematic because your point is, there are others who could have influenced the filing of the complaint and they could be held liable, but they were precluded from being liable by the jury instruction. Correct. But under the Peasley case, technically it's one sentence, but many semicolons and it's a full paragraph. But the language is, any citizen can be held liable if they make a complaint to the government that results in a prosecution and that is made out of malice or ill will. And do we need to get into whether there's an alternative basis to, like, is there evidence of malice here? I mean, I haven't gone through the full record, but it didn't strike me that there was a lot of evidence of malice here. But I guess the question is, can we even entertain that discussion? Can you address both those questions? Well, on its face, the standard of review for the jury instructions issue, and we believe this is a jury instruction issue because it's supplementally giving a definition to a term used in the instruction. So it's a jury instruction issue and that's reviewed de novo. And the standard is, is it confusing? Or does it misstate the law? And it absolutely misstates the law when it says you have to file a complaint. Right. That's why I'm asking then, number one, can we get into, well, because I think you've made the argument that they didn't even argue for prejudice. And so under Clem, we don't even have to look at whether, you know, there was sufficient evidence or anything. It's just, it's inherently an error and we have to send it back. On the malicious prosecution claim, it is error. You, and I don't believe you need to look into, is there evidence of malice or ill will, but- Well, why wouldn't you? Because if there was never any evidence of malice or ill will, wouldn't that be enough grounds to say, okay, there's error here, but it's, there's no prejudice. It's basically harmless error. That is a position that could be taken, Your Honor. But again, with the instructions being on their face deficient and a misstatement of the law, it is impossible for a jury to look at these instructions and in any way rule for the city or rule against the city as to liability for malicious prosecution. That said, if you look at all of the evidence- Wait, wait, wait, back up. What did you just say? To rule, you say it's impossible. The jury instruction said for malicious prosecution, the defendant has to institute a criminal- I understand that. And then the response to the, from the judge was, institute means file the complaint. Even the jury understood that this was not correct, given the parties of the case. The second question that came back with the next day was, we need more clarity. No, I understand that. But what if there was no evidence of ill will? That's my whole question. What if we went through the record and my, I have two questions. Number one, can we do that? You seem to be saying we can't, and that's not intuitive to me. I think normally we could look at this and say, okay, there was an error in the jury instruction, but there was never any evidence presented. So it doesn't matter. So evidence as to- As to the willfulness of the other defendants for the malicious prosecution. We believe there's plenty of evidence of ill will and malice toward, with respect to Tony O'Rourke, Tony Doan, and Mark Sopcich in the individual defendants. We also believe that there's other people that through vicarious liability, there was a vicarious liability instruction that the city could have been held liable for. If you look at the, all of the evidence that we've provided under our opening brief for the 1983 First Amendment retaliation suit, all of the evidence, we cite pages and pages of evidence, in particular as to Doan and Sopcich and O'Rourke in other places. And that is more than sufficient evidence that this is malice or ill will. What was the time, what's the time sequence between him speaking out against the city and its officials in the institution of proceedings? Same day. Okay. He speaks out. So from October to November, he's sending multiple emails complaining about this city project and how ineffectively it's been managing, how bad it's going to be for the city. Those emails, they're in the record, in particular both summary judgment proceedings, where Mr. O'Rourke, the mayor, is being provided these emails and saying, Mark Peterson's going to be a problem. He shouldn't be included in this.  These are all in the record. And November 5th, the morning of, this is in testimony from Mark Peterson in the record, he goes to the 2nd Street Grill in downtown Yakima and stands up at this town meeting with the chamber organized and looks at the mayor and says, this is a problem. What are you doing? This is a mistake. You're going to ruin the city. And then that... He exercised his First Amendment rights. Yes. And that afternoon, the fire inspector shows up at his building. And the testimony of Steve Sargent, which is on day two of the trial, says Tony Doan, the fire inspector, walks in, looks around, walks down the stairs, and before his feet hit the floor, somehow sees the ceiling and says, this is going to be a problem. When he stood up at the meeting, was he charged or did somebody suggest he was being disruptive? Was he removed from the proceeding physically? No. What happened? It was, in his testimony, it was fairly... He stood up, he spoke, and... It was fairly contentious. I'll tell you that you can talk, in his testimony, he talks about what he said and how he said it. Mr. Peterson is brash. He can be. He can sometimes be offensive. Some of the emails you'll see provided, that were provided to the mayor, are that way. But he speaks his mind and he's allowed to do so. That's fair enough. Can I ask you... Because part of the problem here is the malicious prosecution claim. You're probably right that there was an error here, and I'm not sure we got a full answer, but I don't think we can go into whether there was prejudice. So we send this back. Part of the problem here is that the malicious prosecution wasn't for the underlying violations, but it was for failure to allow them to inspect. So I mean, I'm not sure that that's here or there for purposes of our case, but that seems to me that you've got a pretty thin case overall on that particular issue. But that's the charge that was charged against him in January 31st, the next year. Through the three-month period from when Doan walked in... Oh, so you're saying the malicious prosecution... Was all of it. Because when Doan... And here's... Your point is even if there wasn't an underlying violation, you can shoehorn in the underlying violation because your point is there was never an underlying violation, so therefore he didn't have a duty. Not only was there never an underlying... Don't you have a duty to allow an inspection even if you believe you're not in violation? And this is where the case was ultimately dismissed at the criminal level and there was... I understand why it was. You do not have a duty to allow an inspection in two private places. Right. I understand that. Okay. But I mean... And here's the other part. He never denied the violation. That's what's been said in argument and that's what's been said in briefing by the city of Yakima. They said over and over, they said it in opening statements, they said in closing arguments. Multiple witnesses testified to this. They said, we charged him because he's the only person who's ever denied a fire inspection. If you read Tony Doan's testimony, he admits at no point did Mark Peterson ever say you can't come in. In fact... He certainly did not invite them in. They made several attempts to come and there was always some excuse as to why they couldn't come. So I think a jury would be entitled to conclude that he obstructed their coming in because there were several attempts, I think four, and they never somehow were allowed in the building. They were... The first time... After that first time. After the first time, and here's an important distinction, on the 31st, which is the date they use as the denial date for the criminal charge, Mr. Peterson wasn't even there. Yeah, yeah. No, I get that. I'm not... The fire inspector... I read the record. The fire inspector walked in with a witness. No, I understand that. Okay. But here's... The November 5th is kind of an interesting day because he questions in the morning, we have the inspection in the afternoon, then there's the city councilman, he's then sort of the lead questioner that evening, but of course he'd been engaged in email communications before then, so the relevant players knew before November 5th that he didn't like this plan. Exactly. And they were already taking actions against him that he did not... Do we have any evidence about the scheduling by Tony Doan of the inspection, because he had five downtown businesses, only one of which was Mr. Peterson's on that day. Yes. In the morning, he inspected two businesses. One of them was a hotel, a very large building. Then he took a two-hour lunch. Then he went to the block of Mark Peterson, which has three buildings, has five businesses. He visited the first one for four minutes, I believe. It was an architecture firm. He visited the next one for about 10 minutes. The numbers are close. Then he hits Mark Peterson's building, has the whole thing, doesn't finish the block and leaves. And then he immediately goes back and goes to his boss that same day, talks to Mr. Sopcich, and they have some conversation that neither of them recall. Mr. Sopcich then sends just an address with nothing else to the code violations department, the building codes department, to Mr. Denman. The next morning, without any other discussion that nobody can remember and anybody can recall, out of a whole code history, which is hundreds of pages from that address, Mr. Denman responds and provides one sheet of paper and says, I found the document, and sends it to Mr. Sopcich. Mr. Sopcich then turns around and gives it to Mr. Doan and says, I have the document, knowledge is power, knowledge is power, get with me. And then that email is removed. All of this is, it could, a jury can look at this and have it be completely benign. A jury can look at this and see conspiracy. And therefore a jury should have been. So you're not charged conspiracy, so you don't have to prove conspiracy, if that's okay. I got it. Thank you. All right. You want to reserve? 30 seconds. All right. Thank you. There's a button in front of you that you can lower the podium if you would like. You don't have to, but if you feel more comfortable with the podium lower, you can. Can everyone see me all right? So you do. All right. Good morning, members of the panel. May it please the court. My name is Megan Coluccio. I'm here today on behalf of the city of Yakima, the defendant appellees in this case. This appeal is premised on fundamental misstatements of the claims as pled by Mr. Peterson, the appellant. And I'd like to jump in right away to the malicious prosecution issue. Right off the bat, you have to go back and look at what was the claim Mr. Peterson pled. He specifically identified individuals on the respondeat superior theory to pursue against the city of Yakima. And those were the three individually named defendants. In that complaint, he certainly could have referenced the actions of the city attorney's office, the prosecutor's office, other offices within the city. Well, but could he? I mean, those, I mean, yes, he could have, but weren't those, those are protected by immunity, aren't they? They are protected by immunity. Well, I don't, do you, do you, let's cut. Do you agree that the instruction was there? It seems clearly erroneous under Washington law. I don't believe that it was. Any error here was harmless. I think you have to go back. Let me ask a different question, not the instruction, but rather the answers given, the answer given by the judge, because the instruction is clear and I should say the instruction is not erroneous. It's not entirely clear because the instruction doesn't tell us what institute means. Do you agree that the judge misstated Washington law when he said institute means filing a complaint? I don't believe that the judge did, and the reason... You don't believe the judge said that or you don't believe that was error? I don't believe it was error. Okay, I read the Washington cases and I disagree with you. Institute under Washington law for purposes of malicious prosecution means things that Do you agree with that? I do agree with that. Well, then I think we are in agreement and I think the district judge then misstated the law. Fair. Uh, with respect to the, the, the question, the initial question from the jury on those two institute and continued, the cases relied upon by counsel and Mr. Peterson, they don't address those definitions. So the judge went back and gave basic dictionary definitions. The jury didn't demonstrate confusion over the court's answer in the subsequent questions. It's the answer to the second question that gets him in trouble when he merely directs them back to the first answer. Because the second question is, uh, does prosecution, does malicious, does prosecution mean the defendant actually prosecute or prepare the charging document? He then, I'll go back and look at my first answer. And then the third question just multiplies or exacerbates the problem. On the second question, uh, both parties were heard that, that was the first question. Well, it's not the question that was heard, it was the answer the judge gave. The judge said, go back to my first answer. My first answer being charged with filing the, filing the charge. And he's, he's just wrong as a matter of law. Uh, again, I, I believe we go back to abusive discretion standard on this because... Well, but if it... Go ahead. I don't know why it's abusive discretion if we, if he misstates the law. The judge does not have discretion to do that. Well, the instructions themselves, I believe were legally correct. Instructions 13 and 14. I'm not... But you're not hearing me. I'm, I'm, I'm, my problem is the answers the judge gave, not with the instruction itself. Well, ultimately, uh, if the, if the definitions were incorrect, I think you have to go back and look to the, to the question of malice. What was, did this make a difference ultimately in the jury's decision? So, here's my question about that. I don't see that you've really challenged that. I, you, on appeal, I didn't see that you really challenged the prejudice, which I think is where this would come into. Where did you make this argument in your brief? Because that was my, that was what I was trying to flesh out in the, in the opening one is I'm not even sure we can get into this because I don't think you've raised this issue. And then I'd be interested in hearing your response, you know, on substantively, which is where you were going. As to the malice question? Yeah. I mean, I don't think that, I mean, did you raise in your brief that there was, there was no prejudice here because there was no malice? I don't know that I specifically said that in so many words. However, again, taking the record as, as a whole. But, but that's not my, I don't think we just have free reign to just go out and figure this out. If you haven't made the argument to us, I, I'm wondering if we can even do this and, you know, make, make, make this inquiry. Because I think there's something here that there might be some, you know, it's hard as you know, to show complete insufficiency of the evidence for the jury, but I'm just not even sure we can get into the inquiry. And I, I don't know either, Your Honor. It was certainly not an issue that was briefed. Oh, well, okay. Then I think you answered my question. Okay. When the, um, other side in this, like the email communications with the court deputies, I've never seen quite that form of raising question before the judge wants on. Didn't you see a problem? It seems to me that you should have seen a problem and you could have saved the judge from his own mistake, but you didn't. In terms of the request for argument? Well, for reconsidering that answer. I mean, the judge had given an erroneously incorrect answer by the time you've got the answer to all three of those questions. You should have been able to see that and you should have been able to see, oh, if this goes forward this way, we've got an appealable issue on which we might lose. You didn't see that? I did not at the time see that. I was, again, focused on, on the claims as pled, the instructions. But you see, this is a civil case. It's not as pled. It's not like we got an indictment and we're stuck with the indictment. Lots of things happen. We go to trial. We see all, we get evidence, all kinds of things. So it's not, it's not, it's not restricted to the four corners of the complaint at this point so long as it's fairly within the complaint. And I think there's no argument that it wasn't. So you're now dealing with what's been presented at trial, not merely what was in the complaint. Sure. And the theory presented at trial, again, was not a theory against the actions of the prosecutor. The theory at trial was the underlying actions of the three individuals. Exactly. Which is why I think you should have seen the problem. Fair enough. The, the, the cases presented, again, the evidence presented at trial with respect to the malicious prosecution claim and the issue of malice, which does come from the case law. A lot of the answers in, in that period after the case had been submitted to the jury, incorrectly stated the law with respect to false information. There was no evidence presented. I don't believe that's legally accurate under Washington law. So again, the case theory pursued at trial was driven to the three individuals. And the questions and confusion evidently from the jury questions stemmed from a theory that was not pursued and was not supported by the evidence. I don't understand what you're saying because it seems like that's exactly what they were pursuing was the very thing that caused the error here. That they, the, the, the plaintiff was saying there was air, there was malicious prosecution by these three other individuals named defendants and getting them prosecuted maliciously. And the judge precluded that with the answer. I don't believe that's the case. My reading of the jury's questions were directed to the actual prosecutor's office and Cynthia Martinez who testified at trial that she made the charging decision. She made it independently. She believed there was probable cause. Things happened during the course of the criminal case. It was a risk management decision by the prosecutor's office to dismiss the charges. And she. So what was the risk? There was a question of law as to the entrance into private spaces. The risk of losing the case? From the prosecutor's perspective, yes. It was not worth pursuing, potentially losing and going through trial on that issue. Normally when I hear the term risk management, I think of insurance coverage. Sure. And I, I do a lot of insurance defense, so perhaps those are my words as opposed to Ms. Martinez. But it was, you know, a risk benefit analysis and whether or not we go to trial and lose. She wasn't confident that she could get a verdict beyond a reasonable doubt because there was this discrepancy between private and public space. Right. There was a gray area. Can you, have the underlying deficiencies been corrected at this point, like three years later? As. Did, did, did the city just drop everything? The city just ended up dropping. It never even made him correct or, or bring, you know, bring the building up to code. I believe he, he later let the fire department in. I don't know, ultimately, as, as we sit here today. Well, well, as I understand the code violation, it was not the fact that it was per se a violation. It was that he was using that space for a showroom. If he's no longer used it for a showroom, he didn't have to do any work. So I'm, so it's cheap actually to correct the, all you gotta do is say, I'm not going to have that as a showroom. Correct. Yes. And to that point, there was in the record, a lot of discussion about prior inspections and, and not being dinged for violations and years past. We laid this out in the briefing. This was a new section of the fire department that came under their umbrella, the fire code inspection program. And this was the first year that it was with the fire department. So when Mr. Doan, the fire inspector was out inspecting, they were just trying to get a baseline of all of the buildings in Yakima. This was not a scheduled inspection. None of the inspections that were taking place were, they were not, they were not a scheduled inspection. Correct. Meaning that, but, but isn't, I don't know exactly what you mean by that. Meaning they were just, they weren't inspecting to see compliance.  But they want, they had a goal of the fire department itself, getting their own baseline of all of the buildings in Yakima. So it wasn't scheduled in that Mr. Peterson did not receive a phone call that said, we need to schedule your annual fire inspection. Please get back to us with dates, times that work for you. They were essentially just dropping by and completing them. In this instance, they just walked down Yakima Avenue. Do we have any information as to how Mr. Doan on that day chose the five places he had on his, I'll say schedule, but I guess I mean list, because you don't like the word schedule in this context. I don't remember the streets or the borders that they were working from, but they were essentially working from north to south. So that particular day he was working on Yakima Avenue. And he did go, everybody agrees, he went to other businesses on Yakima Avenue. There was a total of five other businesses. I believe three of them, not including Mr. Peterson's, also had serious, what are deemed serious violations, which the ceiling was set up. That schedule was set up before that day. There is not. The testimony is clear that he just woke up and it just, this was, this was an unfortunate happenstance. An unfortunate coincidence. This was the street that they were working, working that day. They just happened to do that on the afternoon after Mr. Peterson had asked questions in the morning. Correct. It just happened to happen. It happened to happen. A really unfortunate set of coincidental facts. Which of course is evidence that goes to the question of sort of targeting, or maybe we could even use the word malice. On the malicious prosecution? Yeah. It goes to that question. Well, on the First Amendment retaliation perhaps. Yes. Yes. And the evidence is. And now let's go to the First Amendment retaliation. We didn't get a chance to talk about that, but the jury acquitted them on the First Amendment retaliation, right? They heard all the evidence and they said there's no evidence here. So now we get into a question of, again, whether the jury instruction, in this case it is a jury instruction, whether it was error, right? Is this the malicious prosecution or the First Amendment? No, no, no. This is First Amendment retaliation. And I'd like to hear your response, because as I understand it, the jury instruction was technically correct, but there was kind of a jumbling of the two, of two different instructions. Yes. So this is in reference to the Ninth Circuit model instructions 9.3 and 9.11, which Judge Rice essentially combined into one. And the way that the model instructions are set up, there's a lot of different claims that can take place. You can have a claim against an individual, a claim against a municipality. So the foundational elements are the first two. Was the person acting under a color of state law and did they violate the right? Right. The question here seems to, I mean, there is this, it's, unfortunately we haven't given a model instruction of how to combine the two. So it seems like it was maybe inartfully done. But the question is, are you aware of, I mean, what's your position for something that's technically legally correct, but might have confused the jury? First of all, what's our standard of review on that? I guess it's abuse of discretion, right? It is an abuse of discretion standard because it's a legally correct instruction. What's the definition of misleading? What when, I mean, how do we, what's the case law for whether this was misleading or not? How do we navigate that? Well, I think on, you know, on one level you look to the fact that the jury didn't indicate there was any confusion on it because they didn't ask any questions or clarification on it. And the first amendment claim was restricted to one individual, Mr. O'Rourke. I think the model instructions, the comments are helpful. I know that there's not a single instruction that instructs how to combine. The gravainment of the argument against it is that number two in the instruction, talking about the first amendment, is really redundant of numbers three, four, and five in the same instruction. That they basically, they like the first amendment argument so much they stated it twice in the instruction. Kind of like walla walla. Correct. I don't disagree. And I have to say, I'm more or less sympathetic to your side. I don't see the problem. Well, I went back and took a look, another read through the model instructions. And I agree it's redundant. But it's very clear from the language that with the first two prongs under the 1983 claim, you have to meet those first two elements. The color of state law, you violate it. And then the comments make clear, in addition to these two elements, you have to hit all of the elements of the subsequent corresponding instructions. So here, the corresponding instruction under the first amendment has those three elements. Those are the five elements that were listed in the verdict form. It's a legally correct instruction. It was not misleading to the jury. There was no indication that they were confused by it. There was no error here. We ask that you affirm the district court and the jury's verdict. Thank you. Thank you. Briefly, I'll pick up where the questioning just left off. Under the final instruction number 11, it wasn't just merged. The first instruction that's model 9.3 was changed. The model instruction... But was there anything legally erroneous? It seems like everybody agrees that the jury instruction didn't misstate the law, but it sort of added this superfluous element. And I'm wondering, first of all, where's the case that says that that is an abuse of discretion? I would say the standard here that we're looking at is, is it legally correct and is it confusing? I would argue... Do you think it's legally incorrect? I do. Okay. And here's why. Because under 9.3, one is act of color of state law. The second one is deprive the plaintiff of his particular rights under the First Amendment to the Constitution. What's erroneous about that? In the model, it says, as defined by later instructions. But what's erroneous about the statement? Because when a jury's sitting in the jury room without access to legal references, they're going to say, one, two, three, four, five. I get that they meant one, three, four, and five, but I don't understand what two means. Okay. But that's my point. It's not legally erroneous. Your argument is it's superfluous. I give you that. It's somewhat superfluous. It's superfluous, it's redundant, and because of those things, it's confusing. But it's not legal. You can't point to a legal error in the instruction, right? I point to the model instructions, and because they're different than the model in the court, it seems to be different model. So give me your best case for why a superfluous jury instruction that is legally correct is misleading. Because, as I stated- What's your best case? When a jury looks at this, they don't know how- What is your best case that supports that position? I don't have a case for that. Okay. I did not understand that you meant legal case. I apologize. I thought you meant my best argument. I'm over, unless there's any particular questions. Thank you, Your Honor. Okay, thank you. Thank you to both counsel for your arguments in this case. The case is now submitted.
judges: HAWKINS, FLETCHER, NELSON